B. M. SMITH v. FIRST NATIONAL BANK OF FLATONIA ET AL.

Decided June 21, 1906.

**1.—Deed—Grantee in esse.**

A number of persons intending to incorporate met, organized by electing officers and selected a corporate name; a deed was executed to them, the grantee being designated by the intended corporate name. Held, the deed was valid in equity, at least, and did not fail for want of a grantee, although the incorporation was never effected.

**2.—Contract to Provide Title.**

A contract to "provide" a perfect title means only that the deed shall convey a good and perfect title. It does not include the furnishing of an abstract showing perfect title.

**3.—Payment of Money—Evidence.**

Without producing the books of the bank the cashier may testify to the fact that a certain item of money was placed to the credit of a certain party on the books of the bank.

**4.—Evidence Without Pleading.**

Facts proven but not alleged can not form the basis of a recovery.

Appeal from the District Court of Fayette County. Tried below before Hon. L. W. Moore.

*Sam'l B. Dabney,* for appellant.—The deed being made to the "Seguin Oil Company of Seguin and Beaumont," never incorporated, failed for the lack of definiteness in a grantee. This company, if it existed, was composed of a great number of persons, and there was no person named as a grantee or one of the grantees in whom the title might vest, in trust. The grantees in a deed, or devisees in a will, must be either artificial or natural persons, or a defined class, as the heirs of a named deceased person; but an instrument, purporting to be a deed to such an association merely, comes within no exception to the rule and is void because the association can not take in trust (as plainly intended by Lane, the grantor in this case) for its constituents, or to carry out any plan; and because not being to any named person or persons, direct, the deed is void for lack of defined grantees. Baptist Association v. Hart's Executor, 4 Wheaton, 1; Green v. Dennis, 6 Conn., 293, 16 Am. Dec., 59, 63, 64; Hornbeck v. Westbrook, 9 Johnson's Reports (Common Law), 73; Jackson v. Cory, 8 Johnson's Reports (Common Law), 385; Winter v. Stock, 29 Cal., 407, 89 Am. Dec., 57; Moreau v. Saffarans, 3 Sneed (Tenn.), 595, 67 Am. Dec., 582; Morris v. State, 84 Ala.,

457; 1 Devlin on Deeds, sec. 190, edition of 1887; 9 Am. and Eng. Ency. of Law, 134, second col. of notes (2d ed.).

Stipulations as to the persons to be engaged in an enterprise and the capacity in which they are to act and their degree of interest, whether direct or indirect, are, in the highest sense, of the essence of the contract and, unless they are exactly complied with, the contract was not formed. National Bank v. Hall, 11 Otto, 50; Grant v. Naylor, 4 Cranch, 224.

On meaning of word "provide" in stipulation made by King that the money should be held in trust until perfect title was "provided" by vendor; and that the word means "to create," "to supply," "to cause to see in advance," "to prepare," "to exhibit;" State v. Brownson, 94 Texas, 440, Am. and Eng. Ency. 23, 90, and notes (2d ed.); Worcester's Dictionary; Webster's Dictionary; also consider meaning of Latin original in this case—"To cause to foresee a perfect title."

That a contract to make "a good and perfect deed," or convey by "perfect title," and a fortiori "to provide" a perfect title throws upon the vendor the duty to exhibit a perfect title, and is not complied with by a tender of a deed formally correct. Fant v. Wright, 61 S. W. Rep., 520; Feemster v. May (Miss.), 53 Am. Dec., 84.

That a vendee is not bound to accept a deed, or to pay for the land, and may rescind when the title is not merchantable, though there be no specific contract, and a fortiori when the vendor's exhibit of title does not show title. Demaret v. Bennett, 29 Texas, 267; Green v. Chandler, 25 Texas, 148; Roberts v. McFaddin, 74 S. W. Rep., 109.

A check was the best evidence, or, if there was no check, the books of the bank, or if these could not be brought into court, as books of a public institution, then a copy of the account covering this matter from the books was the best evidence. Arnold v. Penn, 32 S. W. Rep., 354; Watson v. Boswell, 61 S. W. Rep., 409; Thompson Saving Bank v. Gregory, 59 S. W. Rep., 623-4; Greenleaf, sec. 93.

*Brown & Lane,* for appellees.

REESE, Associate Justice.—This is a suit by B. M. Smith against the First National Bank of Flatonia and T. T. McCommon to recover $1,050 and interest upon the following facts, as alleged in plaintiff's second amended original petition and supplemental petitions.

Plaintiff and a number of other persons by subscription made up $1,050 for the purpose of investing the same, with other persons, in the purchase of a tract of oil land in Jefferson County, Texas. The other persons subscribing to this $1,050 have transferred their claims to plaintiff. When collected the money was remitted to the First National Bank of Flatonia accompanied by a letter to its president, T. T. McCommon. The bank was acting as preliminary treasurer holding the money subscribed until it should be authorized by the proposed organization to pay out the same in the purchase of the land. It is alleged that the land was never purchased by the proposed organization nor was the bank ever authorized to pay out the money or to buy any land, nor was the proposed corporation ever created, but on the contrary at a meeting held at Seguin, Texas, of persons principally interested, in May or June, 1901, at which one Willeford, cashier and acting for the

bank, was present, the purchase of the land under consideration was disapproved and the proposed enterprise abandoned. It is alleged that the terms upon which the money was remitted were stated in the letter accompanying the remittance and addressed to McCommon, president of the bank, as follows:

"In accordance with several conversations with your representative, Mr. W. R. King, over telephone, relative to the organization of the oil company, in which I am told yourself, Mr. Jonathan Lane and others associated with you are chiefly interested, I send you by today herewith $1,050 currency, to cover one and one-half shares of organization stock, subscribed by following named persons."

The letter then proceeds to state the subscribers who have been named above, and then proceeds: "In effecting permanent organization the Victoria Contingent will be gratified by being remembered in the directory," and suggested certain names as directors. Prompt acknowledgment of receipt was requested. The bank through Willeford, its cashier, promptly acknowledged receipt of the money saying: "This is to say this fund is held by this bank for the parties until company is organized and you can so show each one."

It is further averred that the money was sent in the promotion of an enterprise in which Jonathan Lane was one of the persons chiefly interested, that he is now and was at the time a lawyer and man of large affairs, of reputation and character and the money was remitted to be used in an enterprise in which he was and should be concerned, and that plaintiff and his associates did not know that he was not concerned in this enterprise, and not a subscriber to its stock, until after the defendants converted the money to its own use. That the money has been paid over to one T. W. Lane in purchase of certain land in Jefferson County, and that said Lane was unknown to plaintiff and his associates and he never intended to enter into any enterprise with him. That Jonathan Lane was not in fact interested in the enterprise and did not subscribe for any of the stock, and for that reason defendant bank had no authority to pay over the money; that the enterprise was never consummated, nor was any corporation or other organization ever effected, and no authority given by the inchoate organization to the bank to pay over the money, but on the contrary the inchoate organization was abandoned after having directed the bank not to pay out the money and after the bank had agreed not to do so.

In a second count of the petition it is alleged that it had been proposed to purchase a tract of land in Jefferson County having supposed oil possibilities, but the plaintiff and his associates assumed that Jonathan Lane was concerned in the enterprise. The land was claimed by T. W. Lane, that it was understood that the title to the land should be examined by competent counsel; that an abstract was prepared and examined by Dibrell & Mosheim, attorneys, by whom the title was reported as not good and merchantable. That if the contract of purchase was binding upon plaintiff and his associates the same provided for an examination of title which was to be satisfactory to the proposed purchasers and their counsel which was known to defendants, and the title being bad and not merchantable the consideration had failed and the

defendant had no authority to accept a deed from Lane or to pay out the money, and had no authority to pass upon the title or pay out the money even though the title was good.

Defendants answered by general demurrer and special exception, which need not be more specifically mentioned, and generally denied all the allegations of the petition not specially admitted, setting out a history of the transaction. The basis of the suit is substantially as follows:

On or about April 19, 1901, one W. R. King undertook to secure money from persons who might desire to subscribe a sufficient sum with which to buy from T. W. Lane fifteen acres of land in Jefferson County, known as lots 1, 2 and 5, block D, Charles Williams survey, supposed to be oil producing land, said Lane offering to sell for $10,500. The plan upon which King proceeded was to form a company of persons who should buy the land and operate oil wells thereon.

The plan presented by King was that the money was to be divided into fifteen shares of $700 each, called organization stock. W. R. King, E. A. Arnim, for Arnim & Lane (a firm composed of E. A. Arnim and Jonathan Lane), T. W. Lane, W. Willeford and T. T. McCommon, each should and did take one share and King was to dispose of the other ten shares. When disposed of the oil company was to be organized whose capital stock should consist of said fifteen acres of land, at a valuation of $150,000 represented by 150,000 shares at $1.00 each, of which 75,000 shares were to be held by the holders of the fifteen shares of organization stock, and the remaining 75,000 shares to be called "Treasury Stock," and a sufficient amount thereof sold by the company to raise the money to develop the property. The holders of the "organization stock" were to elect the officers and control the oil company when organized. The money collected by King from sale of "organization stock" should be deposited with the defendant bank until all of the shares were sold, when T. W. Lane should make and deliver a deed for the land to the contemplated oil company and the money should be paid over to him.

On or about April 23, 1901, the Victoria people (being plaintiff and those whose interests have been assigned to him) acting as a body, caused one J. E. Buchanan to remit to defendant McCommon, president of defendant bank, $1,050 to cover one and one-half shares of organization stock, accompanying the remittance with the letter heretofore referred to, receipt of which was acknowledged by Willeford, cashier of the bank, as follows: "I have just been asked to come to Seguin this eve to organize and your letter will be placed with them. I have not time to write each one in your letter but this is to say this fund is held by this bank for the parties until company is organized, and you can so show each one." The other eight and one-half shares were disposed of by King and thereby the persons so taking and paying for the fifteen shares of organization stock formed a copartnership or company to buy the land.

On or about April 24, 1901, these persons met at Seguin and organized themselves into a company called the "Seguin Oil Company of Seguin and Beaumont" with capital stock of $150,000, and elected a board of managers or directors, among them Theo. Buhler, selected by the "Victoria Contingent" and they elected a president, vice-president,

second vice-president and manager, and a secretary and treasurer, and thereupon T. W. Lane executed and delivered to the company a warranty deed for the fifteen acres of land, which was dated April 25, 1901, and filed for record in Jefferson County on April 27, and thereupon the defendant bank, in accordance with the understanding of all of the parties, paid over the money to Lane. After this organization the company proceeded to advertise and claim that it was the owner of said land in the "known oil fields of Beaumont" and that not until after the money had been paid over to T. W. Lane and after there was a failure to find oil by persons making borings in the neighborhood was there any intimation from plaintiff or those associated with him that they wanted their money returned to them.

Defendants deny that it was contemplated by any of the parties that they or either of them should receive the deed from T. W. Lane or that they should pass upon the merits of the title, but that the understanding was that the bank should hold it and pay it over to Lane when the company was organized and the deed made. It is alleged that Lane had a perfect title and that the deed passed a perfect title to the company, and that it was executed and delivered upon the requirement of King, it having been contemplated by the parties paying in the money that this should be done as soon as the money was all paid in and an organization perfected, but before the company was incorporated.

In reply to this answer of defendants plaintiff filed lengthy supplemental petitions embracing a general demurrer and many special exceptions, and reiterating and emphasizing the allegations of the petition that the Victoria people were induced to go into the scheme by the representations that Jonathan Lane was chiefly interested in it, and their belief that he was so interested; that it was understood that a corporation was to be organized and the money paid over to Lane after the title was examined and approved, which was never done, and that the deed was executed and delivered without the knowledge of any of the persons associated in the enterprise except those co-operating with defendants and T. W. Lane in the withdrawal of the money. It is alleged that the title to the land is not good and was incomplete in Lane, as shown by the abstract submitted by him, and that at the meeting in June Willeford was notified not to pay over the money to T. W. Lane, at which time he stated that the money was still in the bank, none of the persons present except Willeford and his co-conspirators knowing that the deed had been then executed.

All of the demurrers and exceptions of plaintiff were overruled by the court, and upon a trial by the court judgment was rendered for defendants, from which plaintiff appeals.

The following are the material facts in the case, taken from the findings of fact of the trial court, which are approved:

During the great excitement incident to the discovery of oil near Beaumont, Texas, in the spring of 1901, W. R. King, about the 19th day of April, 1901, undertook to organize an oil company. His scheme was as follows, namely, T. W. Lane, who was the owner of, and had a good title to lots numbers 1, 2 and 5, in block D of a subdivision of the C. Williams league in Jefferson County, Texas, containing 15 acres of land situated about four miles from Spindle Top and supposed to be

oil producing land (said 15 acres of land are those which are fully described in the pleadings of defendants in this suit), was offering to sell the same for $10,500; that said King undertook to raise said sum of $10,500 with the intent to buy therewith said land. This he did by securing subscriptions from such persons as he could induce to take what he was calling "organization stock." That there were to be 15 shares of this organization stock; that the purchaser or purchasers of each of these were to pay therefor $700, thus making up the $10,500 to be paid for said 15 acres of land; that said land when bought was to belong to and be the property of the purchasers who were to be "ground floor people," an organization company or association, and were to own the property in the proportion that their several contributions bore to the $10,500; that this company or association of persons was not to be incorporated but they were simply to buy the land with the intent of making it the "ground floor" or basis of a capital stock of a corporation which they contemplated organizing afterwards; that, after they should organize their "ground floor" company and purchase said land, they would organize an incorporation and secure a charter, which corporation was to have a capital stock of $150,000, this land was then to become the property of the corporation and to be estimated as of the value of $150,000; that the stock of the corporation, when organized, should be divided into 150,000 equal shares of $1.00 each; that 75,000 of said shares should be distributed among the owners of said 15 acres or of said 15 organization shares, in the proportion of 15 to 75,000, and the remaining 75,000 shares should be called "treasury stock" of which sufficient should be, by the corporation, sold to raise money to develop the property, the 15 acres of supposed oil producing land; that the owners of each share of original organization stock should have 5,000 shares of the capital stock and should elect the corporation's officers and have complete control of the corporation's affairs, but it was understood between the said King and those from whom he obtained money with which to buy said land that as soon as the necessary amount should be raised, by the "ground floor people" with which to buy said 15 acres of land, and it should be bought, the money contributed by the purchasers of organization stock should be paid over to the said T. W. Lane for the purpose of buying the said 15 acres. The scheme was that T. W. Lane should, and he did take one of the organization shares; that Arnim & Lane, a copartnership composed of E. A. Arnim and Jonathan Lane, should and they did take one of said "ground floor shares;" that said King should also take, which he did, one of the said "ground floor shares;" that T. T. McCommon and W. Willeford should, and they each did, take one of the said "ground floor shares;" that the remaining ten shares should be sold by said King, and this he did do between the 19th and 23d day of April, 1901.

At the time he, said King, was selling organization stock, the purchasers were all exceedingly anxious to get in on what was called the "ground floor." The fact of organization of the contemplated company became known at Victoria, Texas, and a number of persons at and about that place, which are called in these proceedings the "Victoria contingent" bought one and a half of these organization or "ground floor" shares and paid therefor $1,050; among the "Victoria conting-

ent" was the plaintiff, who contributed $300, and whatever interest, if any, the other persons composing said contingent have in the money contributed by them, has been assigned to plaintiff. That King sold 10 remaining "organization shares" as it was contemplated he should; that while he was selling he instructed those who were buying, to remit the money they were paying for the "ground floor" shares to defendant bank, telling them that said bank would hold the money in trust until the company was organized and a deed would be made by T. W. Lane, which would convey to said organization or "ground floor" company good and perfect title to said 15 acres of land. It was also understood between King and the purchasers of "ground floor" or organization stock, that he and the purchasers of 10 shares which were being sold by him, should have control and management of the company's business affairs; that on the 23d day of April, 1901, one J. E. Buchanan, who was the agent of plaintiff and his Victoria associates and who "were acting together and as a body and jointly," wrote a letter to defendant McCommon, who was president of the defendant bank, in which a draft for said $1,050 contributed by the "Victoria contingent" was inclosed, in which he said that in accordance with several conversations with your representative, Mr. W. R. King, over telephone, relative to the organization of an oil company "in which I am told yourself, Mr. Jonathan Lane and others associated with you are chiefly interested, I send you herewith one thousand and fifty dollars to cover one and one-half shares of organization stock subscribed by following named parties in amounts shown opposite each name." (Then follows a list of the contributors with the amount contributed by each.) The letter then proceeds: "In effecting permanent organization the Victoria contingent will be gratified by being remembered in the directory, and I would recommend the names of Messrs. Theo. Buhler, cashier First National Bank and Mr. D. T. Forbes, V. P. & G. S. N. Y. T. & M. Ry. Co., as good men and acceptable to the interested parties here." That on the 24th of April, 1901, Willeford, the cashier of the defendant bank, wrote to said Buchanan saying: "Yours and $1,050 duly at hand and will be disposed of as stated. I have just been asked to go to Seguin this eve to organize, and your letter will be placed with them. I have not time to write to each one in your letter, but this is to say this fund is held by this bank for the parties until company is organized, and you can so show to each one." That on the evening of April 24, 1901, the required money having been paid in to the defendant bank, the persons who contributed money to buy said 15 acres of land for a "ground floor" met in Seguin, Texas, and proceeded to organize; they assumed and adopted the name of "The Seguin Oil Company of Seguin and Beaumont, Texas." They elected a president (Walter Nolte), a vice-president, general manager, secretary and treasurer, and a full board of directors or managers; that in this meeting the Theo. Buhler, a banker of Victoria, Texas, who had been recommended by the said J. E. Buchanan, was elected one of the board of directors. At this meeting most of the contributors of the money necessary to buy said 15 acres were present and participated. That the officers elected at this meeting caused letter heads to be printed, which they used in correspondence, by which it was shown that "The Seguin Oil Company of Seguin and Beaumont,

Texas," owned lots 1, 2 and 5 in block D in the C. Williams survey in the known oil fields of Beaumont. Said letter heads also showed the names of its president and other officers, and the board of its directors; they showed that its capital stock was $150,000. The said officers also caused receipt books to be issued for stocks, and put in the field to sell the stock agents who were actively selling until the 30th of April, 1901, at which time sales were stopped. There was great excitement at this meeting, and all were anxious to have action taken as speedily as possible. King was present at the meeting and saw and heard what occurred. On the next train after the adjournment of this meeting, two of the directors it had elected went to Beaumont; and upon adjournment of the meeting King telegraphed to T. W. Lane, who was at Beaumont, that the organization had taken place, that the name assumed by the company was "The Seguin Oil Company of Seguin and Beaumont, Texas," that he, Lane, should make and place upon record a deed conveying to said company said 15 acres, and telling him that a committee was going on the next train from Seguin and Beaumont to look after same; that thereupon the said T. W. Lane did execute a deed by which a good and perfect title to the said 15 acres was conveyed to the purchasers of the organization stock in their assumed name of "The Seguin Oil Company of Seguin and Beaumont, Texas." Said deed was dated 25th of April, 1901, was properly acknowledged for record on the 27th of April, 1901, and on that day, by said Lane, was filed for record with the county clerk of Jefferson County, Texas. It was duly recorded in the deed records of Jefferson County, Texas, on the 10th of May, 1901, and was forwarded to and placed in the actual personal possession of Walter Nolte whom the purchasers of the organization stock had duly elected as president of "The Seguin Oil Company of Seguin and Beaumont, Texas;" that same was received by him on the 25th of May, 1901.

That there was no contract or understanding or agreement between said King and Lane, or between them or either one of them and any of the persons who subscribed the money with which to buy said 15 acres of land, to the effect that Lane should furnish an abstract of the title to said land, either to said oil company or to any one for it, which should be submitted to attorneys or to any other person, or that the title to said land should be satisfactory to said company, or to its attorneys, or to be approved by its attorneys before the delivery of the deed should take place. Nor was any other person appointed by the parties to pass upon the title. That the contract was only that the deed should convey a good and perfect title to the land; and after the organization of said "ground floor" company and the furnishing of such deed by said T. W. Lane, the understanding was, that the defendant bank should pay over the money deposited, as hereinbefore stated, to the said T. W. Lane as payment of the purchase price agreed upon for said land.

At the time said money was deposited, the said T. W. Lane had good and perfect title to said land; that he had good and perfect title up to the time he made said conveyance; that the delivery of the deed was such as was contemplated by the parties and passed to said purchasers good and perfect title to said land; that after the delivery of said deed, and organization of said company, as above set forth, said bank, as it

was understood it should do, did pay over said money to said T. W. Lane as the price for the said land.

At the time of the contribution of the $1,050 by the "Victoria contingent" it was not contemplated by any of the parties interested in the scheme that Jonathan Lane should be active in the management of said company, but, on the contrary, it was understood by all parties that the purchasers of the 10 shares of "ground floor" stock which were sold by King as before stated, should themselves with him have the management and control of the business affairs of the enterprise and should elect officers as they saw fit.

Between the 3d and 8th of May, 1901 (exact date uncertain), a meeting of the persons to whom King had sold the 10 shares of "organization or ground floor stock" was held in the bank of Walter Nolte in Seguin, Texas; that at this meeting a representative, one of the Victoria contingent, was present and participated; that at this meeting Mosheim, of the law firm of Dibrell & Mosheim, reported that an abstract which the company had procured, did not show a good title to the 15 acres of land in T. W. Lane; that thereupon the proposed purchasers resolved not to take the land, to abandon the enterprise, demanded that their money be returned to them, and refused to allow a request made by Willeford that Lane be allowed further time in which to show that he did have, and that his deed of 25th of April, 1901, did convey to said purchasers, a good and perfect title to said 15 acres of land.

Assignments of error from 1 to 5 present objections to the action of the court in overruling special exceptions to certain portions of defendants' answer, in which it is alleged that it was the understanding of the parties that a permanent organization was to be effected by the persons holding what is called the organization stock and that when this was accomplished a deed was to be made to this organization. Coupled with these assignments is another which is addressed to the conclusion of law of the trial court that T. W. Lane on the 25th of April, 1901, executed a deed by which a good and perfect title to the land was conveyed to the organization.

None of these objections to the answer presented by these special exceptions can be entertained. Defendants in their answer set out fully and definitely the plan or scheme under which the parties proposed to operate, according to which it was understood and agreed that when the 15 shares of what is called organization stock were all taken, the persons taking the same should effect an organization preliminary to the procuring of a charter for the proposed oil company, and that it was to this organization, and not to the corporation when chartered, that the deed was to be made. It is specifically stated that the holders of this organization stock were to compose this organization which was to be a "co-partnership and company to buy land," and it is also specifically averred that the deed when executed and recorded was delivered to the company. Under the facts alleged in the answer, the execution of the deed and having it recorded under the direction of King, which is alleged to have been done, was a sufficient delivery. (Newton v. Emerson, 66 Texas, 147.)

The proposition presented under these assignments that the deed to

the "Seguin Oil Company of Seguin and Beaumont" failed for lack of definiteness in a grantee can not be sustained. Until the corporation was actually created, by the granting by the proper authority of a charter, the persons co-operating in the steps preliminary to the incorporation were a co-partnership and had agreed to assume the name of the "Seguin Oil Company of Seguin and Beaumont" and as such had effected an organization as is required before a charter can be obtained. If it was contemplated to form a corporation and obtain a charter upon the basis of this 15 acres of land as the sole capital there must necessarily have been a conveyance of the land to the preliminary organization before this could have been done. The statute requires that there be some sort of a preliminary organization inasmuch as the application for the charter is required to state, among other things, the number of directors and the names of those for the first year. (Art. 643, Revised Statutes.) It is required also to be shown that at least ten percent of the authorized capital has been paid in. (Art. 642, subdivision 56, Rev. Stats.) With no other capital paid in but this 15 acres of land, as to which there seems to be no dispute, necessarily the parties must have contemplated that the land was to be conveyed to the persons forming the corporation before application for charter was made. Otherwise we would have to assume that this affidavit was to be made without any regard to the truth of the matter. It can not be said that the $10,500 was to be used as a basis, for the proposed corporation was to have a capital of $150,000 and the most elastic conscience would hardly allow one to state that the $10,500 was ten percent of this amount. The deed to these holders of organization stock under the name they had assumed was valid in equity, at least, and did not fail for want of a grantee. (Frost v. Wolf, 77 Texas, 455; 4 Rose's Notes, Texas Reports, p. 213; Dunlap v. Green, 60 Fed. Rep., 246, and authorities cited.)

What has been said in this connection also disposes of the seventh assignment of error.

The eighth assignment can not be sustained. The conclusions of fact of the trial court that King did raise $10,500 by subscription for 15 shares of organization stock, is fully supported by the evidence. That part of this money was paid to Lane in the adjustment of the business transaction between T. W. Lane and Arnim & Lane and McCommon could not affect the rights of plaintiff and his associates. The essential fact, so far as they were concerned, was that the land should be paid for and a clear deed executed conveying title to themselves and their associates in the pool. By what sort of arrangement other parties paid their proportion was immaterial, insofar as concerns any of the grounds urged by plaintiff in his petition for the recovery of the money paid by him and his associates.

The court allowed the witness King to testify, over the objection of appellant, "that he thought that he did tell Buchanan that Jonathan Lane was a partner of Arnim & Lane as he had always understood the fact," to which appellant excepted. There was no error in the ruling especially in view of the fact that the trial was before the court.

The tenth, eleventh and twelfth assignments are without merit. The finding of fact complained of in the eleventh assignment "that the Victoria contingent did not contemplate or understand that Jonathan

Lane should be active in the management of the company," is fully supported by the evidence, and such finding is adopted by us. Upon this hypothesis it was unnecessary to find further as a conclusion of law whether or not there was a breach of the contract by the use of the money by the proposed enterprise in which Jonathan Lane was not specially interested, and whether or not the interest which he may have had in Beaumont speculation through Arnim & Lane complied with the contract that he should be specially interested. The entire contention of plaintiff with regard to the fact that Jonathan Lane was not "specially interested" in the enterprise rests upon a bare statement in the letter of Buchanan, accompanying the remittance of the money to McCommon for the "Victoria contingent" heretofore set out, in which he speaks of the "organization of the oil company in which I am told yourself, Mr. Jonathan Lane and others associated with you are chiefly interested." This was certainly not more than a representation that the writer had been told that Jonathan Lane was interested in the same way and to the same extent as McCommon and the others interested with him. It falls far short of being even a statement that the writer of the letter had been informed that Jonathan Lane was to be specially interested in the management, and very far short of making it a part of the contract and a condition of the Victoria subscription that he was to be so specially interested. He does not appear to have been present at the organization meeting in Seguin in April, which closed amid great enthusiasm, nor at the subsequent meeting in May or June at which objection was first made to paying over the money on the sole ground that the title was not good. We think this statement in Buchanan's letter to McCommon can not bear the burden which appellant seeks to make it carry, and it does not appear reasonable that the parties themselves should have so understood it. The trial court placed a just construction upon it in holding that the fact that Jonathan Lane was interested through the subscription of Arnim & Lane, of which firm he was a member, for one share of organization stock, was a sufficient compliance with whatever representation was made in the letter of Buchanan to McCommon.

So far as concerns the point raised in the twelfth assignment about McCommon not having been "specially interested," this was immaterial under the pleadings of appellant, which do not refer to this fact at all.

It is a sufficient answer to the assignments of error from thirteenth to seventeenth that we find as a fact, adopting the finding of the trial court, as set out in this opinion, that there was no contract that Lane should furnish an abstract of title, or that the same should be approved, before the money was paid over, but only that the deed should convey a good and perfect title, which the trial court found it did do, which finding we approve. "Providing" a perfect title meant no more than this. An abstract was prepared and presented to the organization which was examined by attorneys and rejected, but Willeford's plea for time to have, not the title, but the abstract corrected or completed was rejected. At any rate when T. W. Lane executed a deed to the company conveying a perfect title to the land every requirement of the agreement was complied with to authorize the paying over of the money by the bank. The parties had no right to demand more than this, not a good

deed merely, but a deed conveying perfect title. There was no guarantee that the land should be oil producing.

What has been last said, with the added statement that we have examined carefully the objections made by appellant to the title and do not think they are tenable and that we agree to all the findings of the trial court as to the title, disposes also of the eighteenth, nineteenth and twentieth assignments of error.

The twenty-first, twenty-second, twenty-third and twenty-fourth assignments are grouped together. None of them can be sustained. No order or check was necessary to authorize the bank to pay over the money. The evidence shows that it was not so contemplated, and no such issue is made by the pleadings. We think it is a fair deduction from the evidence that King, on account of his relation to the parties, upon the organization at Sequin in April, was authorized to so notify Lane and to request him to execute the deed and have it recorded.

There was no error in permitting the witness Willeford to testify that the money paid over by the bank was credited to, turned over or paid over to Lane, as set out in the twenty-fifth and twenty-sixth assignments. The deed was executed, which was an acknowledgment of receipt of the money as between Lane and the grantees. There is no suggestion that Lane claims otherwise. The cashier of the bank could properly testify that it was credited to him without being required to produce the books. If not, the error was harmless and immaterial.

The twenty-seventh assignment presents what would be a serious question if the plaintiff's pleadings had been so framed as to present the issue. By his pleadings appellant seeks to recover back the money turned over to the Flatonia bank on three grounds:

First. Because Jonathan Lane was not chiefly interested in the proposed enterprise, as it was understood he should be.

Second. Because the corporation was not created and there was no authority to make the deed except to the corporation, and

Third. Because the abstract of title showed that T. W. Lane's title was not good.

The fact that McCommon, Arnim and Willeford were themselves the real owners of the 15 acres of land which it was proposed that appellant and other "ground floor" people in connection with McCommon, Arnim and Willeford should buy from T. W. Lane, thus creating what appellant terms a "sub-cellar" under the "ground floor," and that the 15 acres for which it was proposed the parties should pay $10,500 was a part of a tract of 85 acres which T. W. Lane, acting for himself and McCommon, Arnim and Willeford, had just bought for $12,500, is not referred to in any way in the pleadings. Facts proven but not alleged can not form the basis of a recovery. The trial court seems to have taken the same view of this question, as shown by the fourth conclusion of law, where the court is careful to find that "As the pleadings stand" there is no fact deducible from the evidence to support a recovery by plaintiff.

We find no error in the record authorizing a reversal and the judgment is affirmed.

*Affirmed.*

ON REHEARING.

Our attention has been called, upon motion for rehearing by appellant, to an inaccuracy in our opinion, in which it is stated "That the plaintiff (appellant) pleaded that the money had been paid over to one T. W. Lane in purchase of certain land in Jefferson County." The statement should have been that "plaintiff pleaded that defendants (appellees) claimed that the money had been paid over to one T. W. Lane in the purchase of certain land in Jefferson County." The inaccuracy referred to is here corrected.

At the request of appellant the following additional facts are found:

A pool had been formed composed of Arnim & Lane, Willeford, McCommon and T. W. Lane to trade in oil lands. Arnim & Lane, McCommon and Willeford put up the money and T. W. Lane did the trading, taking deeds to lands bought in his own name. They were all equally interested in the profits of such trading in the proportion of one-fourth to Arnim & Lane, and one-fourth to each of the other three. The losses were to be shared by all of them equally except T. W. Lane, who was not to be responsible for losses.

Under this arrangement T. W. Lane bought a tract of 85½ acres of land, of which the 15 acres in controversy here was a part, paying therefor $12,825 and taking the deed in his own name.

The money agreed to be contributed by Arnim & Lane, Willeford, McCommon and Lane was never in fact paid into the bank as part of the $10,500 with which to pay for the 15 acres, nor was the share of Arnim & Lane, Willeford or McCommon ever in fact paid over to T. W. Lane, but their shares were left to be adjusted in the settlement with T. W. Lane of the business in which they had embarked as aforesaid.

*Motion overruled.*

Writ of error refused.